STATE, PLAINTIFF, *v.* GADDY, DEFENDANT.

Common Pleas Court, Paulding County.

No. 2733.   Decided June 5, 1962.

*Mr. John F. DeMuth,* prosecuting attorney, for plaintiff.
*Mr. Sumner J. Walters,* for defendant.

HITCHCOCK, J. Defendant was on June 4 and 5, 1962, tried by a jury for the offense of ". . . wilfully and knowingly resisting a police officer in the execution of his office . . ." in violation of Section 2917.33, Revised Code. Although defendant was acquitted by the jury and the jury's verdict was entered on the journal June 8, 1962, a "Request for Opinion" was filed herein on August 2, 1962, reading:

"Comes now the Prosecuting Attorney on behalf of the State of Ohio and respectfully represents to the Court that, although the defendant in this cause was acquitted, there was in the Court's charge to the jury certain statements of law that are in conflict with Attorney General's opinion No. 3070 (1962); and for future guidance, the undersigned respectfully moves and requests the Court for an opinion in this case."

Opinion No. 3070, rendered on June 15, 1962, by the Attorney General of Ohio holds:

"Under Sections 5503.01 and 5503.02, Revised Code, members of the State Highway Patrol are not authorized to arrest persons riding in automobiles, but not driving said automobiles,

on the charge of intoxication; and are not authorized to arrest such persons walking on the highways merely because said persons are allegedly intoxicated. (Opinion No. 870, Opinions of the Attorney General for 1939, page 1172, followed.)''

The evidence introduced at the trial was to the effect that an Ohio State Highway Patrolman found defendant occupying an automobile parked along U. S. Route 30 in the southwest corner of this county, said automobile being in the highway right-of-way and one corner thereof within five feet of the south edge of the pavement; and that defendant was occupying the front seat under the steering wheel. There was some testimony indicating the automobile might have been entirely south of the south boundary of the right-of-way.

The Patrolman testified that he attempted to arrest defendant without a warrant for the offense of being found in a state of intoxication but did not inform defendant of the cause of his arrest; that defendant was in a state of intoxication; that he resisted the patrolman and fled into a nearby field; that he was captured some thirty or forty minutes later; and after a severe struggle with several patrolmen, was eventually handcuffed and jailed.

The defendant testified he was awakened from sleep by the officer's flashlight at about 8:45 o'clock P. M. on May 4, 1962, and that although he had consumed ''6 beers'' between 1:00 o'clock and 7:00 o'clock P. M. of that date he was far from being found in a state of intoxication when arrested. Incidentally, defendant, subsequent to his acquittal for resisting arrest, entered a plea of ''guilty'' to the charge of being found in a state of intoxication and was fined.

In the pertinent part the Court charged the jury:

''. . . The things necessary to constitute the offense charged here are—

''a. The officer, Patrolman S. K. Scott, must have been in the execution of his office.

''b. The defendant must have resisted said officer, and,

''c. The defendant must have done so knowingly and willfully.

''Patrolmen of the Ohio State Highway Patrol are officers within the meaning of this section of the code. Every such

patrolman may arrest without a warrant any person found in a state of intoxication in an automobile upon a highway in this state.

"If you find from the evidence, beyond a reasonable doubt, that Patrolman Scott found defendant in an automobile on the highway right-of-way, or any part thereof, apparently in a state of intoxication, and attempted to place him under arrest you may conclude that Patrolman Scott was in the execution of his office. . . ."

In preparing this charge the Court read Sections 5503.01 and 5503.02, Revised Code, and the sections therein mentioned, with care and concluded that the quoted portion of the charge stated the Ohio law by reason of these words from the statutes:

". . . patrolmen shall be vested with the authority of peace officers for the purpose of enforcing the laws of the state which it is the duty of the patrol to enforce, and may arrest, without warrant, any person who, in the presence of . . . any patrolman, is engaged in the violation of any such laws. . . ." Section 5503.01, Revised Code.

"The state highway patrol shall . . . enforce, on all roads and highways, notwithstanding Section 4513.39, Revised Code, the laws relating to the . . . use of vehicles on the highways; . . ." Section 5503.02, Revised Code.

"No person shall be found in a state of intoxication. . . ." Section 3773.22, Revised Code.

The correctness of the court's charge rests upon the determination of whether or not an offense under Section 3373.22, Revised Code, if occurring on any portion of the right-of-way of any public road or highway in this state is one ". . . relating to the . . . use of vehicles on the highways. . . ." Although the statute here includes "operation" with "use" no consideration was given to the word "operation" as we have a statute which proscribes "operation" of vehicles by persons while under the influence of "intoxicating liquor," and the further reason that the word "use" embraces a wider field of activity.

In preparing the charge in this case the Court noted O. A. G. 870, 1939, which was, ten days later, followed and approved in O. A. G. 3070, 1962. It also observed that no annotation showed any Court ruling determining the same issue. Believing

that it is "emphatically the province and duty of the judicial department to say what the law is," the Court thereupon explored the question as one of first impression. Incidentally, counsel for the defense took exception to this portion of the charge, but as the jury returned a verdict of "not guilty" no appeal has been taken.

For light on the meaning of the words "relating to the . . . use of vehicles on the highways," the Court began with current Volume 36A, Words & Phrases, Permanent Edition, but no case was found where this precise phrase had been defined and construed. Five cases, each having an Ohio situs, were found which the Court finds helpful, to-wit: *State* v. *Forney*, 108 Ohio St., 463, 141 N. E., 16 (1923); *Bowles* v. *Ohio Fuel Gas Co.*, D. C. Ohio, N. D.-E. D., 65 F. Supp., 426 (1946); *N. L. R. B.* v. *Goodyear Tire & Rubber Co.*, D. C. Ohio, N. D.-E. D., 36 F. Supp., 413 (1940); *City of Akron* v. *Willingham*, 166 Ohio St., 337, 142 N. E. (2d), 653 (1957); and *City of Washington* v. *Looker*, 73 Ohio Law Abs., 36, 136 N. E. (2d), 140 (1955).

In *Forney* the question was whether an act of the state legislature entitled "An act to revise and codify the laws relating to the levy of taxes, and the issue of bonds by taxing subdivisions, and to establish a budget system for local expenditure" was one subject to referendum at the next election or one to go into immediate effect unburdened by referendum because of the language of Section 1d, Article II, Ohio Constitution, reading, "Laws providing for tax levies, appropriations for the current expenses of the state governments and state institutions, and emergency laws necessary for the immediate preservation of the public peace, health or safety, shall go into immediate effect." The Supreme Court of Ohio held that exceptions to the operation of laws, whether statutory or constitutional, should receive strict, but reasonable, construction and that the express language "laws providing for tax levies" is limited to an actual self-executing levy of taxes, and is not synonymous with laws "relating" to tax levies, or "pertaining" to tax levies, or "concerning" tax levies.

In *Bowles*, Wilkin, J., said at p 429:

"The defendant contends that the provision of Executive Order 9620 providing that 'all prior regulations, rulings, and other directives relating to the Office of Economic Stabiliza-

tion: should remain in effect' did not include regulations, etc. issued by 'The Office of Economic Stabilization.' Therefore, it contends, Directive No. 1, which designated the Price Administrator as the agency to receive notices of utility rate increases, was revoked by Executive Order 9620 because Directive No. 1 was not a directive 'relating to' the office of Economic Stabilization but was a directive 'issued by' that office. Such an interpretation of Executive Order 9620 seems too restrictive. In its ordinary meaning, 'regulations, ruling, and other directives relating to the Office of Economic Stabilization': would seem to include those issued by that agency as well as those otherwise pertaining to it, and there is no indication that the President did not use the phrase according to its ordinary meaning.''

In the *N. L. R. B.* case, the issue concerned the scope of information which could be required of a witness receiving a *"subpoena duces tecum"* issued by the Board. There, at page 415, Jones, J., declared:

''The Board is given the power to subpoena any person to produce any evidence *relating to* the matter under investigation or in question; the Court is given jurisdiction, upon application by the Board, to issue an order requiring obedience to its subpoena calling for the production of evidence touching the matter under investigation or in question. . . .

''. . . '*Relating to*,' or 'touching,' the matter, are not words which are synonymous with 'relevant' and 'material,' *nor do they have such legal significance as these latter words.*'' (Emphasis supplied.)

*Willingham* was found guilty of ''speeding'' under an Akron ordinance in the city's municipal court. The court suspended his driver's license on the ground he had been convicted of an offense ''relating to reckless operation'' of a motor vehicle. The Fifth District Court of Appeals reversed the judgment of suspension but certified the question to the Ohio Supreme Court as being in conflict with a judgment of the First District Court of Appeals in *State* v. *Joiner*, 77 Ohio App., 298, 66 N. E. (2d), 161 (1945). The Supreme Court of Ohio, in a unanimous per curiam opinion reversed the Court of Appeals and affirmed the trial court. It found that defendant's plea of guilty to a charge

of unlawfully operating a motor vehicle "at the rate of 60 miles per hour in a 25-mile zone, such speed being greater than was reasonable and proper, having due regard to the traffic, surface, and width of said street, and other conditions then existing, in violation of (a specific ordinance) is an admission he was driving without due regard for the rights of others.

Thus the Supreme Court of Ohio approved the rule of *Joiner* where defendant's license was first suspended for a speeding violation (as an offense relating to reckless operation) and further suspended for driving while the original suspension was in effect. In the *Joiner case, Matthews, J.*, speaking for a unanimous First District Court of Appeals concluded the courts' opinion with these words:

"* * *

"Certainly, the power to suspend for speeding has relation to reckless driving and, if so, the power to enforce the suspension has equal relevancy."

The Supreme Court of Ohio, by its decision in *Willingham* has definitely supplanted the *Looker* opinion of the Second District Court of Appeals which stands for the proposition that a "speeding" offense is not one "relating to reckless operation." Of course "speeding" and "reckless operation" are no doubt separate and distinct offenses under our statutes and ordinances. See *City of Akron* v. *Hull*, 72 Ohio App., 449, 52 N. E. (2d), 877, 27 Ohio Opinions, 384 (1943).

Although it may be that common sense is the sense that uncommon men have, this court is of the opinion that statutory language ordinarily should be construed in a manner appealing to the common understanding and the common sense and reason which we expect in any community of free men. Certainly in this community it is commonly understood that "relating to" embraces much more than such words as "directly connected to" or "a part of." We constantly use the words "relating to" in many circumstances where time and again we find an event or a status often leading to or in our experience being followed by a common consequence.

The Ohio Department of Highway Safety in its report of 1961 traffic accident facts in Ohio reveals, inter alia, the following:

## OHIO TRAFFIC ACCIDENT FACTS FOR VARIOUS TIME PERIODS, 1961

| Classification | During 1961 | | | Yearly Comparisons | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Per Day | Per Week | Per Month | 1960 | 1961 | Change '60 to '61 |
| Traffic deaths | 5 | 32 | 140 | 1,907 | 1,674 | —12% |
| Injuries | 222 | 1,556 | 6,743 | 80,425 | 80,920 | 1% |
| Accidents[1] | 385 | 2,700 | 11,701 | 149,809 | 140,415 | — 6% |
| Economic cost of accidents | $790,000 | $5,600,000 | $24,000,000 | $320,000,000 | $290,000,000 | — 9% |
| Property damage[2] | $147,000 | $1,030,000 | $4,470,000 | $58,800,000 | $53,600,000 | — 9% |
| Drivers involved[3] | 696 | 4,883 | 21,161 | 271,149 | 253,929 | — 6% |
| Motor vehicles involved | 735 | 5,162 | 22,367 | 286,666 | 268,405 | — 6% |

Notes: (1) Reported accidents only.

(2) Property damage in reported accidents.

(3) Excludes drivers of legally parked vehicles.

With knowledge of this current volume of traffic accidents can we not better appreciate the practical problems posed by the facts revealed in these paragraphs of the report?

"On rural state highways, half of all accidents from midnight to 3 am involved a drinking driver. For the three-hour period from 9 pm to midnight, 36% of the accidents involved a drinking driver; from 3 am to 6 am, 35%.

"Drinking driver involvement in reported accidents was lowest for the hours from 6 am to noon when only 4% of the accidents involved drinking drivers.

"During the hours of daylight, only 9% of the accidents on rural state roads involved drinking drivers; at night, 34% of the accidents involved a drinking driver."

Although the report fails to reveal any information concerning the activities on the highways of drinkers other than drivers we can guess from the experience of the drivers and from the facts of our commonplace social life that they will chiefly occur during the 8 hours following 6:00 o'clock P. M.

Section 3773.22, Revised Code, proscribes a state of intoxication for anyone, anywhere, anytime, within the confines of this state. When a person is found in such a state within the boundaries of any road or highway right-of-way can it be said that he is not guilty of an offense "relating to the . . . use of vehicles on the highways"? I believe that a contention that he is not cannot seriously be maintained.

Anyone with knowledge of the subject knows that intoxication produces results which are as different as individuals are different; that the action which any specific person will take when intoxicated is unpredictable. The law and common sense concur when they both require every person on the highways, whether pedestrian, driver, or passenger, and regardless of condition, to exercise due care in regard to every other person there.

Most of us probably recall some incident of which we have knowledge where a child's sudden, unexpected action, caused a traffic accident or crisis of some kind; also, where some sudden, unexpected, unpredictable action by one drunk or under the influence of alcoholic beverages produced a like result. Most of us who have driven automobiles for more than a quarter of a century, I am sure, have had the experience while driving

or dodging (or stopping in the nick of time) to avoid an intoxicated person.

Then there is the intoxicated pedestrian who steals or "borrows" an automobile and proceeds upon the highway until catastrophe overtakes both him and some innocent victim. If we have no personal knowledge of such an incident we can hardly have failed to notice numerous such reports in our daily newspapers.

Then there are those not infrequent cases where several fellows go out to "do the town" as they say. We must be blind to common experience not to recall such episodes where, after several terrified citizens have complained to the police, a chase begins. Then when the game appears to be about up, the intoxicated driver vacates the driver's seat and abandons the automobile or puts a sober occupant in charge and defies the officer who ultimately arrives to prove the guilt of the true malefactor.

It is certain that intoxicated persons found upon the highway, whether afoot or on wheels, are using the highway for some purpose and that their presence there affects and relates to the "use of vehicles on the highways."

In view of these facts of life how can it be said that intoxicated persons on the highways, when not driving and whether, riding or walking, do not constitute a traffic hazard "relating to the . . . use of vehicles on the highways"?

In *Forney*, our Supreme Court, quite rightly I think, indicates that "relating to"; "pertaining to" or "concerning" are commonly understood to be synonymous for nearly all purposes, and that they adequately describe with reasonable strictness the things which in common experience are closely associated with other specific things or situations. Consequently, this court concludes that when any person is found in a state of intoxication within the boundaries of the right-of-way of any Ohio road or highway he is violating a law "relating to the . . . use of vehicles on the highways"; that this law (Section 3773.22, Revised Code), as in force in the areas delineated by the boundaries of our road and highway right-of-way is one which it is the duty of the Ohio Highway Patrol to enforce; and that those found engaged in violating it in such areas may

without warrant be arrested by the Highway Patrolmen, as well as by other peace officers.

In reaching this conclusion the Court has not been unmindful that it will be said—"Why, if a sober fellow goes to a tavern and gets a little too much and asks a sober friend to drive him home, the patrolmen can arrest him anyplace on the road home without a warrant!" This is true enough and the Court has noticed a conviction for being found in a state of intoxication at *home*. (See 83 Ohio Law Abs., 468, referring to No. 18,874 in the Municipal Court of Columbus.) This Court believes, however, that patrolmen generally would approve—perhaps applaud—if even 90% of those who drink at taverns or elsewhere until their normal physical facilities are measureably impaired—were to insist upon being taken home only by sober drivers. The Court finds it hard to imagine that the feared contingency will ever become a public problem and is content to leave improbable future problems to the future.

This Court is aware that under the Ohio Constitution criminal laws must be strictly construed and that in *State* v. *Schultz*, No. 2683, decided in this Court on December 16, 1960, it approved and followed *State* v. *Mikola*, 82 Ohio Law Abs., 517, 163 N. E. (2d), 82, 12 Ohio Opinions (2d), 25 (1959), concerning an offense under Section 4511.19, Revised Code. Nevertheless, this case is not inconsistent with *Schultz* because there the Court was confronted with uncontroverted evidence and the meaning of words (used to describe an offense) which our legislature had specifically defined. Furthermore, Section 5503.02, Revised Code, describes no offense; only the powers and duties of the state highway patrol. When our legislature uses common words without specifically defining them the test of reasonable strictness is met when courts give them their common, everyday meaning.

Consequently, unless or until the rule of this case be overruled or supplanted, this court will adhere to this interpretation of present Ohio law.